The next case for argument is 18-1944, In Re Rosen. Good morning. Good morning, Your Honor. Please proceed. May it please the Court. The case that we have before us today relates generally to a composition for the control of bed bugs. The inventors in this case have determined that this composition is actually quite effective and have built a small business around it specifically for the control of bed bugs. At the bottom of page 24 of the blue brief and continuing on to 25, you claim that person-skilled would construe inert ingredients as inactive ingredients. Do you have any positive testimony on this in the record? I'm sorry, Your Honor. I didn't catch the last part. Do you have any person-skilled testimony on that in the record? We do not, Your Honor. But that so that statement draws primarily from the reference itself, which I believe comes from the Hiramoto reference. It labels, okay, so it labels this very long list of relatively unrelated components. That's not the question I asked. Right, right. It labels them as. No, it's not the question I asked. You're asking us to interpret it. You said that a person-skilled would interpret it. So that list is labeled LIS-4A, which is from the Code of Federal Regulations. In the description in the Code of Federal Regulations, it describes it as, and I have exactly what it describes it as, LIS-4A is generally reserved for those substances that are common foods or substances that are ubiquitous in nature and not expected to present a hazard to human health or to the environment. Counsel, this is a composition claim. It lists half a dozen or so components, and all of them are in the prior art, and most of them are described as being effective for insecticides or other pests. And what has been shown to be exceptional compared with what one would expect from putting all these components together? Well, we believe that the USPTO, so where we, you know, there may not be any secondary considerations here within the case itself, but we believe that the USPTO has nevertheless failed to provide a prima facie case of obviousness here. Based on, simply based on the fact that it's a known problem in the art that bed bugs are resistant to conventional insecticides. So it's not necessarily expected that these conventional, very common household ingredients would come together to make a composition that would be effective to treat against these bed bugs. In the red bracket 20, the government notes that if you had wanted to limit the claim composition to controlling bed bugs, you could have included an affirmative limitation, but you didn't. What's your response to that? So if I'm understanding your question, Your Honor, you're basically asking why the limitation of the use in the preamble should be considered to be part of the claim. And the reason for that is based on various case laws from this very court. For example, the corn and glass case, which we discussed in our brief, the court mentions that the effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim. Now the only thing, the only type of insecticide discussed in this application is for bed bugs, and no other insect is discussed or described at all. The claims are very obviously narrowly tailored toward a composition for treating bed bugs. Okay, let me read you from page 20 then. At bottom, if appellants wanted to limit the claim composition to controlling bed bugs, they could have included an affirmative limitation requiring that result or perhaps better included a separate method claim reciting that particular use of the claim composition. But appellants did not do that. Rather, appellants canceled method claims for, quote, controlling climax infestations by applying the composition in claim one during examination in response to a restriction requirement. Appellants cannot moot that restriction by reading method limitations in the composition claim one. Yes, Your Honor, the method claims were restricted out early on, but we do disagree that, number one, that a purpose is specifically for method claims. Purposes are routinely included in preamble language for a number of reasons. One reason of which is kind of discussed in the In Re Claim decision from this court, which basically held that the preamble language serves to, informs as to what the relevant prior art should be considered. The claim pesticide, the specification states, may also contain one or more additional ingredients. Will one ingredient suffice? I'm sorry, Your Honor. Can you repeat the first part? Sure. In the red brief at two, the government notes that the specification also claimed that, I'm quoting, also states that the claim pesticide, quote, may also include one or more additional ingredients, close quote. My question is, will one additional ingredient suffice? I'm sorry, Your Honor. I'm not exactly recalling this part. Well, it's a comprising claim. Yeah. So it would include one or more. Yes. Yes. Yes, it could. But the fact is the claim without the preamble stands on its own because it's a composition of X, Y, Z. W, X, Q, R, X, Y, and Z or whatever. Yes, ordinarily. So the preamble isn't part of the claim. We believe that, and we believe that the case law supports that the preamble should at least inform as to what should be considered relevant prior art. Excuse me. In the red brief at 33, the government says you waived your arguments regarding Olson as disclosing the inclusion of sodium chloride because you didn't raise it before the PTAB. Did you raise those arguments before the PTAB? I, well, we did raise them during prosecution. I'm not sure that they were raised before the PTAB itself. So I take that as a no. Yes. Because you wouldn't know your record. Correct. Correct.  There is not, Your Honor. And actually the PTO never actually disputes at any point that despite the fact that these ingredients are all common and accepted as generally safe, that the product is in fact effective against bed bugs. The office never raised a rejection based on utility or enablement. But the patent office here did not meet its burden to prove a prima facie case of obviousness. At the most basic level, it just hasn't met the grand factors because it did not show that there was a motivation to select these particular ingredients from among the thousands of possibilities available across the six. Do you agree that Enan and Olson disclosed six of Claim 1's limitations? That Enan and Olson. Sodium lauryl sulfate, potassium sorbate, sodium chloride, and organic acid in essential oil and water. I am aware of that, Your Honor. They disclose it without the context of the difficulties of treating bed bugs. And so the examiner used the Enan reference as the primary reference here. Well, Enan also discloses treatment of over 2,000 other types of insects. Including bed bugs. Including bed bugs. Well, another thing that Enan says is that its compositions would not be predicted to work evenly across the board. Now this, taken with the appellant's own specification stating that conventional insecticides don't ordinarily work on bed bugs. The skilled artisan just would not look to Enan for any, would not believe that there were bed bugs. And that disclosure of Enan would provide any reasonable expectation of success for controlling bed bugs specifically. In doing so, the PTO also, sorry, I've kind of lost my place. I'd like to talk a little bit more about the phrase composition for control of Cymex in the preamble. We believe that the board should not have read this limitation out of the claim. So, for example, I began discussing In re Klein earlier. The preamble in that case recited a convenience nectar mixing device for use in preparation of sugar water nectar for feeding hummingbirds, orioles, or butterflies. But the court in that case found that the problem there was not just a problem for compartment separation. It was a much more specific problem of multiple ratio mixing. And that information only came from the preamble. So the court in that case sided with the appellant's narrow construction in order to find that several of the references constituted non-existent. And we believe the court should do the same here. And just one more remark, and I'd like to save the rest of my time for rebuttals. Knowing the scope of the problem is critical to developing a working composition, which speaks to the path taken by the skilled artisan, and therefore logically establishes the bounds for the prior art. If there are no further questions... Okay, thank you. William Lamarcker for the PTO. Really, our only point, Your Honor, I think there's no dispute that the prior art references have all the ingredients disclosed. Well, here's what I'm struggling with a bit, and that's only 1D, the nutrient source and yeast. So, you know, there are a lot of references around here. There was some discussion of this about the IDS, you know, and what the examiner... Seemed to be a little tension between what the examiner said, what the board said. So can you just take a shot at it? Yeah, nutrient source. Well, my understanding of what that means in the claim, and from the record, what I've gleaned is the nutrient source in this particular example is yeast. The Olson reference specifically says to use food attractants. The idea is you've got an insecticide to kill insects. You add a food attractant that draws the insects to the insecticide, they eat it, and this is how they get the insecticide. The sodium chloride concentration, interestingly, is the same as it is in human blood. How is that not a food attractant for this particular... Yeah, I mean, I think you could interpret it that way, Your Honor, but for purposes of this record, the examiner didn't look to that as a food attractant. They looked to that as one of the things that act as the insecticide. In other words, one of the active ingredients that actually kills the bug. You mean human blood kills the bug? No, but I think when you have salt, it might be similar to human blood. That could act as an attractant, but I don't think the examiner viewed it that way in this particular case. Sodium chloride, acids, oils, all these things can act as insecticides, and they're natural. They're not harmful to the environment. That's the idea. And all the prior art pretty much teaches that. I mean, I don't think there's any dispute that all of the prior art that's been cited talks about safe insecticides. Well, what I took away from these briefs is I planted lemongrass in my garden. Yeah, but I think getting back to Chief Judge Proce's question about the yeast, the food attractant, the nutrient source, Olson specifically says it would be good to include a food attractant with your mixture. Olson doesn't cite yeast. Correct, but there are two other references. I believe Hiramoto has a list of the food ingredients, and I believe opposing counsel was mentioning it was an FDA list. And that FDA list includes, as one of the food ingredients, yeast. Would you say he could have overcome this rejection if he had a comparative test between his composition with yeast and the same composition without yeast? Well, what I can say, Your Honor, is we understand the law. I think the way you've articulated it partly here today is that if there's a composition of matter, a list of ingredients like we have here, the office comes forth with prior art that discloses at least overlapping disclosure of those ingredients, and they've done that. Many of them for the same purpose. And if the applicant wants to come back and rebut that, one of the things that they could do is come forth with some evidence of criticality, evidence of unexpected results, evidence showing that their specific combination, their specific unique combination, has some type of special results, but they would have to produce evidence. They would have to come forth with some evidence to show that, and none of that happened here. If the SIMEX treatment had been the key, you could have filed a divisional on the method. And I believe there was a restriction here. Those method claims were taken out, and, of course, they would have the opportunity to file a divisional on those method claims, Your Honor. That's, of course, at their fingertips if they choose so. But ultimately, I think your question, you're right. If they could come back with some evidence showing that a specific combination is somehow unique or critical and show some experimental evidence to establish that, that would be a different story. The office would have to consider that and make a determination. But ultimately, all the ingredients are disclosed by the prior art. It's in the same field. What's the field? Insecticides that are safe and environmentally safe. That's the field. The ordinary artist from trying to come up with this would look to these references, and because they would look to these references, because they are analogous art, we think it's sufficient for the obviousness rejection that was written. And as a result, we have a prima facie case, and there is no evidence to come forth to rebut that prima facie case. And as a result, we think the agency's decision should be affirmed. Any other questions? Thank you, Your Honor. So I would just like to make a few quick points to piggyback on some of the questions that just came up. First, regarding the nutrient source. So the office hinges much of their arguments on the fact that this Hiramoto reference actually discloses a food source. Well, this list, list 4A as they call it, is not a list of food sources. Not unless you consider Douglas fir bark, nylon, oyster shells, and sawdust to be sources of food. So the office cites... I'm sorry? I said if I was a bug, I might. Possibly, but the list was in the context for human consumption. But regardless, the office... The office then cites to the Olson reference to show that there would have been motivation to have a nutrient source, which then goes back to the Hiramoto reference, which discloses this food source. But the loop is really not closed, because there's nothing in Hiramoto that would make the skilled artisan think that yeast could be food. Especially food for bed bugs. The last point that I'd like to make is just to generally speak about the mechanism of how the inventors believe that this composition works. So the composition is developed to mimic human tissue. So that's kind of where the sodium chloride comes in, and where the yeast comes in. This kind of combination is new, and that's not really shown to have been done before. So the bed bugs come in and engorge themselves, and when that happens, their bodies just blow up. I don't know if you've ever seen pictures of it, but they get very big. The remainder of the composition in the local environment interacts with their exoskeleton, and it kind of begins this suffocation effect. And the inventors believe that it kills them in seconds. And this effect is not really talked about in any of the prior art. As far as we know, it's new, novel, and unobvious. Thank you very much.